```
-------------------------------------------------------x
                                        :
THURLOW LAWSON                          :          3:17 CV 247 (JGM)
                                        :
V.                                      :
                                        :
NANCY A. BERRYHILL,                     :
ACTING COMMISSIONER OF SOCIAL           :
SECURITY                                :          DATE: MARCH 20, 2018
                                        :
------------------------------------------------------ x
```

## RULING ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"].

## I. ADMINISTRATIVE PROCEEDINGS

On January 27, 2012, plaintiff applied for DIB benefits claiming that he has been disabled since August 14, 2011 due to anxiety, severe pain in his back and legs, depression, and diabetes. (Certified Transcript of Administrative Proceedings, dated March 31, 2017 ["Tr."] 70-71, 86-87; see Tr. 90, 183-85, 203). The Commissioner denied plaintiff's application initially, and upon reconsideration. (Tr. 100-06). On or about December 3, 2013, plaintiff requested a hearing before an Administrative Law Judge ["ALJ"](see Tr. 108-09; see also Tr. 107, 110-11), and on February 10, 2015, plaintiff and Joseph Goodman, a vocational expert, testified at a hearing before ALJ Matthew Kuperstein. (Tr. 33-68; see Tr. 112-48).[1] Plaintiff proceeded without counsel. (See Tr. 36-40; see also Tr. 149). In a decision dated August 6, 2015, ALJ Kuperstein denied plaintiff's request for benefits. (Tr. 11-26). On

---

[1]Plaintiff was accompanied by a friend who did not testify. (Tr. 35-36).

October 1, 2015, plaintiff filed a request for review of the ALJ's decision (Tr. 7–8; see Tr. 9-10), and on July 29, 2016, an attorney from the Herman Law Group submitted a memorandum in support of plaintiff's appeal. (Tr. 301-05). On December 23, 2016, the Appeals Council filed its notice denying plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3; see Tr. 4-6).

On February 17, 2017, plaintiff commenced this current action (Dkt. #1), and on March 30, 2017, the parties consented to this Magistrate Judge's jurisdiction and the case was transferred accordingly. (Dkt. #14). Thereafter, on April 26, 2017, defendant filed her answer and copy of the Certified Administrative Transcript, dated March 31, 2017. (Dkt. #18).[2] On June 15, 2017, plaintiff filed his Motion for Judgment on the Pleadings, and brief in support. (Dkts. ##24-25; see also Dkts. ##22-23). On October 25, 2017, defendant filed her Motion for Judgment on the Pleadings (Dkt. #33), and four days later, on October 29, 2017, plaintiff filed his reply brief. (Dkt. #34).

For the reasons stated below, plaintiff's Motion for Judgment on the Pleadings (Dkt. #24) is granted in part and denied in part, and defendant's Motion to for Judgment on the Pleadings (Dkt. #33) is denied in part and granted in part.

## II. FACTUAL BACKGROUND

### A. PLAINTIFF'S ACTIVITIES OF DAILY LIVING

Plaintiff is forty-seven years old (Tr. 70), and lives alone in an apartment. (Tr. 48, 189). He completed high school, and at the time of his hearing, he was serving bread, changing light bulbs, vacuuming, and dusting as a volunteer at the Salvation Army about once a week; plaintiff has served as a volunteer at the Salvation Army since August 2011.

---

[2]There was some duplication in the administrative record.

(Tr. 49-50, 203-04).  According to plaintiff, he volunteers there "maybe 20, 25 hours a month." (Tr. 50).

On an average day, plaintiff watches television, goes shopping, and cares for his pet parakeet. (Tr. 189; <u>see</u> Tr. 57, 193).   He prepares his own meals, performs household chores, and goes outside every day.  (Tr. 191-92).  According to plaintiff, his impairments affect his ability to walk, sit, and stand for long periods of time.  (Tr. 190). When he walks, he needs to "stop and rest a bit because of [his] back and right [ankle]." (Tr. 193; <u>see also</u> Tr. 194).  Plaintiff testified that if he is "lucky, [he] could sit for maybe [twenty] minutes to a half . . . hour, [and] stand maybe [fifteen] minutes, [twenty] minutes."  (Tr. 54). Additionally, he suffers from migraine headaches two to three times a month which affect his speech and vision. (Tr. 57-58, 60).   Plaintiff has been prescribed Imitrex which reduces the intensity of his migraine pain.  (Tr. 59).  Plaintiff also suffers from depression.  (Tr. 60).

Plaintiff takes or has taken Metformin, Glyburide, Lisinopril, Propranolol, Clonazapam, Ibuprofen, Lantus Solostar, Klonopin, and Flexeril (Tr. 191, 206, 261, 270, 275, 279-80, 282; <u>see</u> Tr. 640), and he receives five or six cortisone injections each year.  (Tr. 279).

Plaintiff worked in the shipping and receiving department of Goldenrod Corporation from 1994-2000 (Tr. 276), and then as a custodian for Col-Linx from 2002-2003 (Tr. 53-54; <u>see</u> Tr. 164-65, 168, 178-79, 198, 276 (2001-2003)), and for Bozzuto's in 2004-2005 (Tr. 53; <u>see</u> Tr. 164, 168, 177-78, 199). From 2006 to 2012, plaintiff worked as a custodian at the Salvation Army; he also drove a vehicle to pick up and drop off donations, as well as pick people up for Sunday services.  (Tr. 51-52; <u>see</u> Tr. 153-54, 162-63, 168, 175-76, 200, 205, 212-13, 215, 276 (2008-2012), 277 (2007-2012), 283 (2007-2012)).

Plaintiff testified that he is disabled due to an injury to his back on August 14, 2011; he continued to work after he was injured but he stopped working in February 2012 due to

back pain. (Tr. 46-47, 52). In 2013, 2014 and 2015, plaintiff volunteered with the "kettle work" for the Salvation Army. (Tr. 52; see Tr. 175, 283).

A vocational expert, appearing telephonically, testified at plaintiff's hearing that plaintiff's past work is classified as medium unskilled and medium semi-skilled work. (Tr. 61-62). In response to a hypothetical posed by the ALJ, the vocational expert opined that an individual limited to light exertional work, without strict time or production requirements, without collaboration of coworkers, and with no more than minor changes in the work environment could perform the work of a "cleaner custodian[.]" (Tr. 62-63). However, such an individual could not perform the work of a "cleaner custodian" if limited to work that did not involve constant standing and/or walking, and if such an individual was limited to sedentary work, such an individual could work as a document preparer, screener, and ticket checker. (Tr. 63-64). Additionally, such a hypothetical individual could perform the foregoing three jobs even with the additional limitations of occasional climbing, balancing, stooping, kneeling, crouching or crawling, and having to avoid concentrated exposure to hazards such as the operation of motor vehicles or heights or moving machinery. (Tr. 64). However, according to the vocational expert, if the individual was further limited to only frequent handling, fingering, or feeling, the ticket checker position would be eliminated, but such an individual could perform the work of a polisher. (Tr. 64-65). A limitation of occasional handling, fingering, or feeling with the above-referenced combination of limitations would preclude all work. (Tr. 65). The vocational expert also testified that if the individual was off-task for more than ten percent of the workday, in addition to regularly scheduled work breaks on a regular basis, that individual could not perform any work. (Tr. 66). However, according to the vocational expert, a hypothetical person limited to sitting for thirty minutes and standing for twenty minutes at a time, could perform any of the identified

occupations.  (Tr. 66-67).

B. MEDICAL RECORDS[3]

Plaintiff alleges that he has been disabled since August 14, 2011.  (Tr. 70-71). Accordingly, although the Court has reviewed the entire administrative record, the Court limits its discussion of plaintiff's medical history to the relevant time period as addressed below.[4]

1. SHOULDER AND BACK AILMENTS

Plaintiff was seen by Dr. Gabriella Gellrich at the Community Health Center ["CHC"] on May 16, 2011 for "recurrent sciatica[]" and complaints of a headache. (Tr. 328-29, 567-68). Plaintiff returned to Dr. Gellrich on November 7, 2011 for lower back pain and right ankle pain; his medical record notes that he is overweight; he "[d]oes not follow [a] low fat diet[]"; and his back pain was "now interfering with his job." (Tr. 324-25, 563-64).  On January 18, 2012, plaintiff was seen by APRN Debra Dresden at CHC for pain management for his back.  (Tr. 321-23, 560-62).  Plaintiff had "poor hygiene[,]" and "spasm of [the] lumbar paraspinals, negative SLR test, [and] no spinal tenderness[.]" (Id.). On February 28, 2012, plaintiff was seen by Dr. Gellrich for back and right ankle pain; he was diagnosed with

---

[3]At the hearing, the ALJ noted that he did not have medical records from Dr. Lenczewski and Dr. Aaronson (Tr. 41-43), but that he would request the documents following the hearing (Tr. 43), as well as request documents from Monte Wagner, APRN.  (Tr. 44-45).  Accordingly, on April 29, 2015, ALJ Kuperstein informed plaintiff that he secured additional medical evidence from Drs. Aaronson and Lenczewski, as well as APRN Wagner.  (Tr. 298-99).

There are several notices of appointments for consultative examinations (see generally Tr. 241-42) with Dr. Joseph B. Guarnaccia (see Tr. 226-27, 231, 237-39; see also Tr. 232, 240); Thomas Kocienda, PsyD (Tr. 222-25, 228-29, 233, 235; see also Tr. 230, 234, 236); Dana Martinez, PsyD (Tr. 243-45, 247, 249, 281; see also Tr. 246, 248); and Industrial Medicine Associates (Tr. 250-57; see also Tr. 258). See Section III.A. infra.

[4]There are multiple records of treatment of common ailments, for which plaintiff is not seeking disability.  (See Tr. 326-27, 330-33, 453-54, 470-73, 516-17, 565-66, 569-75, 596).

herniated disc syndrome. (Tr. 319-20, 558-59). Three weeks later, on March 19, 2002, plaintiff was seen by Dr. Gellrich for migraines. (Tr. 317-18, 556-57). Two days later, plaintiff returned to Dr. Gellrich complaining of "severe back pain[]" after cleaning his apartment; he also presented with DSS paperwork for Dr. Gellrich to complete. (Tr. 315-16, 554-55).

On April 18, 2012, Dr. Gellrich noted that plaintiff continued to gain weight after he stopped working, but that his back pain "somewhat improved." (Tr. 353-54, 552-53). Plaintiff underwent an MRI of his lumbar spine on April 26, 2012, which revealed "[g]rade 1 anterolisthesis L5-S1 due to bilateral spondylolysis of L5 and facet arthrosis[;] [d]iffuse spondylotic disk bulging asymmetric to the left[;] [s]evere left foramen stenosis with impingement upon existing left L5 root[;] [and] [m]oderate right foramen stenosis." (Tr. 586). On May 2, 2012, Dr. Gellrich noted that plaintiff's MRI was "significant for nerve impingement at L5." (Tr. 349-50, 548-49). Plaintiff returned with DSS paperwork on July 10, 2012; he continued to gain weight and did not have "much improvement in [his] functional status after completing physical therapy." (Tr. 343-44, 542-43; see generally Tr. 605 (May 2012 physical therapy record)).

On February 11, 2013, plaintiff was seen by Dr. Gellrich for right shoulder pain that began a month earlier. (Tr. 534-55). Plaintiff was unable to extend his arm into the air; he was referred for an MRI. (Tr. 534). Plaintiff returned to Dr. Gellrich on March 27, 2013 for medication refills and right shoulder pain, for which he underwent an MRI on February 23, 2013. (Tr. 530-31; see Tr. 532-34, 583-84). Plaintiff had limited range of motion, and right rotator cuff tendinopathy with partial thickness tearing of his right subscapularis tendon. (Tr. 530; see Tr. 583-84). Plaintiff was referred for physical therapy. (Tr. 530; see generally Tr. 604, 606 (April-May 2013 physical therapy records)).

Plaintiff was seen for back pain and right shoulder pain on June 18, 2013. (Tr. 528-29). Upon examination, he had spasm of lumbar paraspinals, and it was noted that he had steroid injections in his back;[5] he was referred for physical therapy. (Id.).

Plaintiff was seen at the CHC by APRN Wagner for complaints of back pain on July 2, 2013, and again on August 12, 2013. (Tr. 503-04, 518-20). On July 2, 2013, plaintiff rated his pain as a seven on a scale to ten. (Tr. 518). At his August appointment, he had mild pain with full back flexion and negative straight leg testing. (Tr. 503-05). He was also referred for a brain MRI to rule out a TIA two days prior. (Tr. 504). In September 2013, plaintiff underwent an MRI for a "sudden onset severe headache," the results of which were normal. (Tr. 490-91; see Tr. 581-82).

On October 2, 2013, plaintiff was seen at Physical Medicine and Rehabilitation ["PMR"] by Dr. Beth Aaronson for his low back pain that occasionally radiated to his left knee. (Tr. 637-39). On October 7, 2013, plaintiff was seen for his right shoulder pain which was "not too severe at [that] point[.]" (Tr. 595). Plaintiff was seen on October 29 and November 12, 2013 by Dr. Aaronson for his low back pain; he reported side effects from pain medications, and complained of increased pain when walking. (Tr. 633-36). On December 3, 2013, plaintiff returned to Dr. Aaronson for his low back and leg pain. (Tr. 592-94, 631-32). Plaintiff had bilateral muscle spasms; he was assessed with lumbar radiculopathy. (Tr. 593, 632).

On January 9, 2014, plaintiff was seen at the Western Connecticut Health Network

---

[5]Plaintiff underwent epidural injections at the L5 vertebra on August 10, 2012 (Tr. 336, 585), October 7, 2013 (Tr. 603, 655-56), and December 30, 2013. (Tr. 600-02, 653-54, 657-58). Plaintiff received additional injections on March 17, 2014 (Tr. 598-99, 651-52, 659), November 19, 2014 (Tr. 383-85) and December 9, 2014. (Tr. 597, 650, 660).

Orthopedic Clinic ["Western Orthopedic Clinic"] for a followup evaluation of his right shoulder pain. (Tr. 591). On examination, plaintiff had full range of motion and some "minimal tenderness to palpation." (Id.). Plaintiff returned to PMR on February 18, 2014 for back and left leg pain; he reported the most pain during and after walking, and increased pain when sitting. (Tr. 628-30). On February 27, 2014, plaintiff underwent an MRI of his lumbar spine, the results of which revealed "[s]table grade 1 anterolisthesis L5-S1 secondary to L5 spondyloysis and facet arthropathy[,]" as well as "[s]table diffuse posterior disc osteophyte complex extending to the left resulting in severe left neural foraminal stenosis with probable impingement upon the exiting left L5 nerve root, unchanged[;] [and] [s]table moderate right neural foraminal stenosis." (Tr. 579).

On March 25, 2014, plaintiff reported to PMR that his pain level was seven on a scale of ten and it increased when walking. (Tr. 625-27). On May 6, 2014, plaintiff reported that steroids did not help his back pain and he refused to try pain medications, but he reported that he was still walking two to three miles a day. (Tr. 622-24). On June 10, 2014, plaintiff reported some improvement for his back pain with physical therapy. (Tr. 618-21). On October 7, 2014, plaintiff returned to PMR to report that his back pain had "gotten worse[]" and that his injections only lasted one and a half weeks. (Tr. 613-17). On November 19, 2014, plaintiff reported to Dr. Aaronson that he had no lasting effects from the spinal injections. (Tr. 610-12).

On February 18, 2015, plaintiff returned to PMR, at which time he reported to Dr. Aaronson an inability to walk and that he was contemplating surgery. (Tr. 607-09). Six months later, on June 11, 2015, plaintiff was seen by Dr. John Mullen at the Western Orthopedic Clinic for his right shoulder pain, which was "feeling significantly better." (Tr. 587). On examination, plaintiff had full range of motion, 5/5 strength, and neurovascularly

8

he was intact.  (Id.).  Dr. Mullen concluded that plaintiff had "[r]esolved right shoulder pain."  (Id.).

## 2. DIABETES AND OBESITY

On April 20, 2012, plaintiff received nutritional counseling at CHC relating to his diabetes.  (Tr. 351-52, 550-51; see Tr. 552-53).  Plaintiff was seen by a registered dietician on June 11 and again on July 11, 2012 for diabetes education. (Tr. 341-42, 347-48, 540-41, 546-47).  On June 27, 2013, plaintiff had numbness in his toes and Dr. Susan Glasman at CHC assessed him as having neuropathy due to his diabetes.  (Tr. 523-24). Plaintiff returned again for appointments with a registered dietitian in August and September 2013. (Tr. 492-502, 506-15).

Plaintiff was seen for medication refills with APRN Wager at CHC, and for general follow up on January 28 and April 7, 2014; he reported that he was feeling well.  (Tr. 480-85).  Plaintiff was seen by APRN Wagner, a registered nurse, and a registered dietitian at CHC from May to November 2014 for diabetes monitoring, nutrition counseling, and a follow up for his back pain.  (Tr. 434-52, 455-69, Tr. 474-79).  As of that time-frame, plaintiff had lost forty pounds over the previous two years.  (Tr. 446).  Plaintiff generally appeared well.  (Tr. 435, 440, 451, 463, 466).  For physical activity, plaintiff reported walking around town as much as he is able "given [his] back problems."  (Tr. 459).  A physical examination on November 27 by APRN Wagner revealed mild back pain with full back extension, and negative straight leg raise testing, despite claiming a pain level of 9.  (Tr. 435).  On November 3, 2014, plaintiff complained of severe headaches with pain looking into light, loud noises and strong smells, as well as feeling nauseous.  (Tr. 440).

On January 19, 2015, plaintiff was seen by APRN Wagner for a follow up and medication refills at CHC (Tr. 429-30; see also Tr. 432-33), and a month later, on February

17, 2015, plaintiff returned for nutrition counseling. (Tr. 423-24; <u>see also</u> Tr. 426-28). Three days later, plaintiff was seen by APRN Wagner for medication refills (Tr. 420), and on February 27, 2015, he returned with "paper work [to be] filled out[.]" (Tr. 421-22).

### 3. ANXIETY AND DEPRESSION

On June 14, 2012, plaintiff was seen by Dr. Gellrich with complaints of anxiety; he reported that he applied for disability on account of his anxiety. (Tr. 345-46, 544-45). He was referred for a psychiatric evaluation. (Tr. 345, 544). On June 25, 2012, plaintiff was seen by Dayna DiBiasi with DSS paperwork. (Tr. 372-73, 417-18). It was noted that plaintiff was poorly dressed, and that he has a long standing history of anxiety and panic attacks. (Tr. 372, 417). On July 14, 2012, plaintiff was seen by Debora Faria, LCSW at CHC for mood symptoms; he was assigned a GAF of 45 and he agreed to therapy and a visit with a psychiatrist. (Tr. 370-71, 415-16). On August 9, 2012, plaintiff was seen by Bruce Stevens, APRN, at CHC with paperwork for DSS and complaints of anxiety and a lack of desire to leave his home. (Tr. 368-69, 388-89). Plaintiff was seen by Faria on August 30 and September 13, 2012; his mood was anxious, his affect blunted, his speech was whispered, and his thoughts were delayed. (Tr. 366-67, 413-14). He agreed to follow up with a psychiatrist. (<u>Id.</u>). On October 1, 2012, plaintiff presented with paperwork to be excused from jury duty due to his "severe anxiety disorder." (Tr. 339-40, 538-39). Ten days later, plaintiff was seen by Faria for generalized anxiety disorder; he exhibited anxiety, a risk for suicide, and severe withdrawal. (Tr. 364-65, 411-12).

On October 25, 2012, plaintiff returned to Dr. Gellrich with disability paperwork to be completed by his "mental health provider." (Tr. 337-38, 536-37). On November 1, 2012, Faria saw plaintiff for anxiety, severe withdrawal, and risk of suicide. (Tr. 363, 410). Plaintiff was anxious, with a constricted affect, incoherent and slurred speech, slowed thought

process, and a fear of going out.  (Id.).   From December 2012 to February 2013, plaintiff

continued to see Faria (see Tr. 401-09), during which time he expressed an interest to go

back to Tennessee to be with his family and friends (Tr. 403); he reported going to the mall

but having to be picked up by a friend because he felt overwhelmed (Tr. 407); he discussed

volunteering at the local shelter (Tr. 408-09); he discussed his relationship with neighbors

and people at his church (Tr. 405); and he reported that he had helped at his church holiday

party.  (Tr. 407). Plaintiff was fully oriented with a depressed mood, and his insight and

judgment were minimally impaired.  (Tr. 401, 403-09).

In April and May 2013, plaintiff was seen by Faria (Tr. 398-400); he expressed fear

over his housing situation, and appeared to have a depressed mood, anxious affect, delayed

speech, and slow thought process. (Id.).

On June 24, 2013, plaintiff was seen by Dr. Antigone Kostas at CHC for anxiety.  (Tr.

525-27).   On examination, he was dressed appropriately, with good/anxious mood; his

thought process was concrete; and his insight and judgment were fair but limited.  (Tr. 526).

He was seen again by Dr. Kostas on July 1 and 10, 2013 because the Lexapro and Prozac

she prescribed made him sick.  (Tr. 514-15, 521-22).

On October 8, 2013, plaintiff reported to Dr. Kostas that "everything [was] going

wel[]l" and his anxiety was "doing very well." (Tr. 488-89).  He denied having had any panic

attacks in the last six months, and upon examination, he was appropriately dressed with a

good mood and normal affect.  (Tr. 488).  Plaintiff returned on January 13, 2014 for a refill

of his medication.  (Tr. 486-87).  His mental examination was normal.  (Tr. 486).

On July 11, 2014, plaintiff returned to Faria with complaints of panic attacks around

people he did not know.  (Tr. 396-97).  In August 2014, plaintiff went to CHC for refills.  (Tr.

455).  Plaintiff attended group therapy on September 12, 2014, and October 22, 2014.  (Tr.

386-87, 390-91; see Tr. 394-95). The group encouraged plaintiff to try breathing exercises, meditation, and physical therapy. (Tr. 386-87; see Tr. 394-95). On November 11, 2014, plaintiff returned to Faria; he had a depressed and anxious mood, sad and slow affect, normal speech, and minimally impaired judgment and insight. (Tr. 392-93).[6]

## III. DISCUSSION

Following the five step evaluation process,[7] ALJ Kuperstein found that plaintiff engaged in substantial gainful activity from his alleged onset date of August 14, 2011, through February 28, 2012 (Tr. 17, citing 20 C.F.R. §§ 404.1571-1575), but has not engaged in substantial gainful activity since February 29, 2012. (Id.). ALJ Kuperstein then concluded that since February 29, 2012, plaintiff has had the following severe impairments: obesity, degenerative disc disease of the lumbar spine, degenerative joint disease of the right rotator cuff/right shoulder, anxiety disorder, depressive disorder and personality disorder. (Tr. 17-18, citing 20 C.F.R. § 404.1520(c)). In the third step of the evaluation process, the

---

[6]The medical opinions and assessments of State agency consultants will be addressed in Section III.A. supra.

[7]Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. § 404.1520 First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. See id. If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 404.1520(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. § 404.1520(a)(4)(iii); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. See 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. § 404.1520(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

ALJ concluded that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18-20, citing 20 C.F.R. § 404.1520(d), 404.1525 and 404.1526). In addition, at step four, ALJ Kuperstein found that after consideration of the entire record, plaintiff has the residual functional capacity ["RFC"] to perform light work[8] as defined in 20 C.F.R. § 404.1567(b), except that he has the following additional limitations: no strict time or production requirements; a nonpublic work environment without the collaboration of coworkers; no more than minor changes to the work environment; sitting only thirty minutes at a time and standing for twenty minutes at a time; and, occasional climbing, balancing, stooping, kneeling, crouching or crawling and needing to avoid concentrated exposure to hazards, such as the operation of motor vehicles, heights, or moving machinery. (Tr. 20-24). ALJ Kuperstein concluded that plaintiff is unable to perform any past relevant work, but there are jobs that exist in the national economy that plaintiff can perform. (Tr. 25-26, citing 20 C.F.R. §§ 404.1569 and 404.1569(a)). Accordingly, ALJ Kuperstein concluded that plaintiff has not been under a disability from August 14, 2011 through the date of his decision. (Tr. 26, citing 20 C.F.R. § 404.1520(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ erred in his RFC assessment (Dkt. #25, at 14-20), and the ALJ failed to give proper weight to the opinion of plaintiff's treating physician (id. at 20-23). Additionally, plaintiff contends that the testimony of the vocational witness does not constitute substantial evidence (id. at 24-27); and the ALJ failed to provide plaintiff with a full and fair hearing as

---

[8]Light work as defined in 20 C.F.R. § 404.1567(b) involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, and jobs in this category require a good deal of walking or standing, or sitting most of the time with some pushing and pulling of arm or leg controls.

an unrepresented claimant.  (Id. at 27-30).

Defendant contends that the ALJ fulfilled his duty to develop the record (Dkt. #33, at 16-17); substantial evidence supports the ALJ's RFC for light work (id. at 18-19); the ALJ's sit/stand option in the RFC is supported by substantial evidence (id. at 19-21); the ALJ properly weighed the opinions of the record (id. at 21-23); and the ALJ's step five decision is supported by substantial evidence.  (Id. at 24-25).

A. WEIGHT ASSIGNED TO OPINIONS OF RECORD

In his decision, the ALJ assigned "great weight to the assessments of the State [a]gency psychologists regarding the claimant's mental residual functional capacity[.]" (Tr. 24).  The ALJ found that Faria and Dr. Gellrich's report, dated November 1, 2012,[9] which the ALJ described as "a check off style form" "address[es] the extent of the claimant's problems in multiple areas without providing actual[] limits that the claimant has in his mental residual functional capacity."  (Id.).  The ALJ concluded that the "treatment notes in the record fail to even reflect that the claimant even has a level of problems in the areas described in [that] form."  (Id.).  ALJ Kuperstein also concluded that little weight is afforded to this assessment given that it was "signed by [the] physician who prescribes the medications for the claimant,

_____

[9]On November 1, 2012, Dr. Gellrich and Faria co-signed a  Psychological Functional Capacity Assessment (see Tr. 357-60) in which they opined that plaintiff has "fair" attention and concentration, he is "not able to focus under pressure[,]" he has "flight of ideas[,]" "obsessions at times[,]" a constricted affect, and his judgment and insight were impaired such that he was not able to make decisions without help.  (Tr. 357-58).  Utilizing the check box format of the form, they concluded that plaintiff has an obvious problem with his hygiene and a serious problem caring for his physical needs, using good judgment, using appropriate coping skills, and handling frustration appropriately.  (Id.).  Additionally, he has a serious problem interacting appropriately with others in a work environment; asking questions or requesting assistance; respecting/responding appropriately to others in authority; and getting along with others without distracting them. (Tr. 359).  According to Dr. Gellrich and Faria, plaintiff has an obvious problem carrying out single-step instructions, and a very serious problem carrying out multi-step instructions; focusing long enough to finish assigned simple tasks; changing from one simple task to another; performing basic work activities; and performing work on a sustained basis.  (Id.).

14

but the physician did not actually provide treatment, as the record fails to reflect that the physician has evaluated the claimant." (Id.). Plaintiff asserts that the ALJ erred in assigning "great weight" to the opinion of the State agency psychologists,[10] and "little weight" to the treating source's assessment. (Dkt. #25, at 20-21)(emphasis omitted).

Under the treating physician rule, an ALJ assigns weight to the treating source's opinion after considering:

(i) the frequency of the examination and the length, nature, and extent of the

---

[10]On February 20, 2013, Katrin Carlson, PsyD, a State agency provider, completed a Psychiatric Review Technique of plaintiff in which she assessed affective disorder, anxiety-related disorder, and personality disorder. (Tr. 79-80). Dr. Carlson opined that plaintiff has moderate restrictions in his activities of daily living, moderate difficulties in maintaining concentration, persistence or pace, and marked difficulties in maintaining social functioning. (Tr. 79). On the same day, Dr. Carlson completed a Mental Residual Functional Capacity Assessment of plaintiff in which she concluded that plaintiff is moderately limited in his ability to maintain attention and concentration for extended periods and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace, and is markedly limited in his ability to work in coordination with or in proximity to others without being distracted by them. (Tr. 81; see Tr. 80-82). Additionally, Dr. Carlson concluded that plaintiff is markedly limited in his ability to interact with the general public, and moderately limited in his ability to ask simple questions, accept instructions and respond appropriately to criticism, get along with coworkers or peers, maintain socially appropriate behavior, respond appropriately to changes in a work setting, travel in unfamiliar places, and set realistic goals or make plans independently. (Tr. 81-82). On July 1, 2013, Christopher Leveille, PsyD, a State agency medical consultant, completed a Psychiatric Review Technique of plaintiff in which he reached the same conclusions as Dr. Carlson. (Tr. 94-95).

Additionally, on February 19, 2013, Dana Martinez, PsyD. completed a Mental Status Examination of plaintiff as part of a consultative examination in connection with his application for benefits. (Tr. 374-76). Dr. Martinez noted that plaintiff had two hospitalizations for anxiety, each for twenty-four hours, and that he has a history of group therapy. (Tr. 374). She noted that plaintiff did not complain of pain, but that he walked with a limp, he readjusted frequently when seated, and he winced in apparent pain. (Tr. 375). Additionally, he had difficulty standing from a sitting position. (Id.). Dr. Martinez's diagnostic impression was major depressive disorder; rule out schizoid personality disorder; chronic pain, hypertension, high cholesterol, Type II diabetes; and a GAF of 50. (Tr. 376).

A month later, on March 6, 2013, Dr. Iktikhar Ali completed a physical medical examination of plaintiff in connection with plaintiff's application for benefits. (Tr. 378-82). Dr. Ali noted mid-back and low back pain, right shoulder pain, hypertension, and diabetes and anxiety, and he concluded that plaintiff had no restrictions. (Tr. 378, 382). According to Dr. Ali, plaintiff did not appear to be in acute distress; his gait was normal; he did not need help getting on or off the examination table; and he was able to rise from the chair without difficulty. (Tr. 380).

treatment relationship; (ii) the evidence in support of the opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(per curiam), citing 20 C.F.R. § 404.1527(d)(2)(now § 404.1527(c)(2)). "After considering the above factors, the ALJ must 'comprehensively set forth his reasons for the weight assigned to a treating physician's opinion.'" Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008), quoting Halloran, 362 F.3d at 33; see 20 C.F.R. § 404.1527(c)(2)(stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion.")(emphasis added)). Treating source opinions are entitled to controlling weight when they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence of record, 20 C.F.R. § 404.1527(c)(2); Halloran, 362 F.3d at 32 (treating source opinion may be discounted where it conflicts with the other evidence of record), however, the ALJ may discount opinions that are conclusory, are unsupported by medical signs and laboratory findings, are inconsistent with other substantial evidence of the record, and are not from treating sources entitled to controlling weight. Only "acceptable medical sources" can be treating sources whose medical opinions can be afforded controlling weight, Social Security Ruling ["SSR"] 06-03p, 2006 WL 2329939, at *1 (S.S.A. Aug. 9, 2006), and licensed clinical social workers do not fall within the category of "acceptable medical sources." See id.

The underlying medical records are replete with entries from Faria, plaintiff's treating therapist; however, although plaintiff saw Dr. Gellrich on several occasions, he saw her for physical impairments, such as back pain, ankle pain, migraines, shoulder pain, and sciatica pain, as well as medication refills. (See, e.g., Tr. 315-25, 328-29, 349-50, 353-54, 530-35,

554-57, 548-49, 563-64, 567-68). Plaintiff was seen by Dr. Gellrich for his anxiety on only one occasion; plaintiff reported to Dr. Gellrich that he applied for disability on account of his anxiety, and Dr. Gellrich referred plaintiff for a psychiatric evaluation. (Tr. 345-46, 544-45).

Faria's opinions, as opinions of "other medical sources," are "important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file[,]" SSR 06-03p, 2006 WL 2329939, at *3,[11] and the ALJ properly considered such opinions in his decision. However, when the opinion of an "other source[,]" in this case the licensed clinical social worker, is co-signed by an "acceptable medical source[,]" "'but there are no records or other evidence to show that'" the acceptable medical source "'treated [the claimant], the [other source's] opinion does not constitute the opinion of a physician[,]'" and thus, is not entitled to controlling weight. Goulart v. Colvin, No. 3:15 CV 1573 (WIG), 2017 WL 253949, at *4 (D. Conn. Jan. 20, 2017), quoting Perez v. Colvin, No. 13 CV 868 (HBF), 2014 WL 4852836, at *26 (D. Conn. Apr. 17, 2014), report and recommendation adopted, No. 13 CV 868 (JCH), 2014 WL 4852848 (D. Conn. Sept. 29, 2014). Thus, contrary to plaintiff's argument, the ALJ properly considered this assessment and explained his reasons for the weight he assigned thereto. In the absence of a treatment history with Dr. Gellrich for mental health issues, the ALJ did not err in failing to assign controlling weight to this opinion, and the ALJ properly considered the content of the opinion in relation to the content of Faria's underlying treatment records.

---

[11]SSR 06-03p directs the application of the same factors used to evaluate "acceptable medical sources[,]" namely, the length of the treating relationship and how frequently the source has seen the individual, the degree to which the opinion is consistent with other evidence in the record, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise related to the individual's impairments, and any other factors that tend to support or refute the opinion. Id. at *4-5.

<u>B. DUTY TO RECONTACT SOURCES AND COMPLETING THE RECORD</u>

Plaintiff argues that because the ALJ failed to accept the treating sources' conclusion, he erred in "not tak[ing] the next logical step [by] recontact[ing] the treating sources." (Dkt. #25, at 22-23).[12] The ALJ has "an affirmative duty to develop the administrative record," <u>Burgess</u>, 537 F.3d at 129, "in light of the 'essentially non-adversarial nature of a benefits proceeding.'" <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 (2d Cir. 1999), <u>citing Pratts v. Chater</u>, 94 F.3d 34, 37 (2d Cir. 1996). However, "[w]hile there is case law suggesting that an ALJ has a duty to develop the record where there are 'inconsistencies' in a treating physician's records, . . . we believe such cases should be read as requiring further development of the record only where the record was incomplete." <u>Evans v. Comm'r of Soc. Sec.</u>, 110 F. Supp. 3d 518, 538 (S.D.N.Y. 2015)(citations & internal quotations omitted). In this case, as discussed above, Faria's treatment records were appropriately considered by the ALJ, and the medical opinion co-signed by Dr. Gellrich was considered and evaluated consistent with the underlying record. There is no indication that the ALJ afforded "little weight" to her opinion because of incomplete treatment records. As the Second Circuit reiterated just last month, an "ALJ [is] under no obligation to recontact [a treating source] where there [are] no obvious gaps in the administrative record and the ALJ possessed [the claimant's] complete medical history." <u>Rusin v. Berryhill</u>, No. 17-CV-643, 2018 WL 1052572, at *1 (2d Cir. Feb. 28, 2018), <u>citing Rosa</u>, 168 F.3d at 79 n.5 ("[W]here there are no obvious gaps in

---

[12]According to plaintiff, this case is "similar" to <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998), in which case the Second Circuit concluded that there was "a serious question as to whether the ALJ's duty to develop the administrative record was satisfied[.]" However, that case differs from the case at hand as in <u>Clark</u>, the treating provider completed two residual functional capacity assessment which were at odds with each other and which reflected a substantial deterioration in that claimant's condition. <u>Id.</u> at 117-18. In this case, however, plaintiff's treating providers offered one assessment which is unsupported by the underlying medical records.

the administrative record," and where the ALJ already possesses a "complete medical history[,]" the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim"); see also Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996)). Accordingly, this Court concludes that the ALJ fulfilled his duty to develop the record.

## C. RESIDUAL FUNCTIONAL CAPACITY ANALYSIS

As stated above, the ALJ concluded that plaintiff has the RFC for light work with limitations of working without strict time or production requirements in a nonpublic work environment without the collaboration of coworkers, and with no more than minor changes to the work environment. (Tr. 20). Additionally, the ALJ concluded that plaintiff has various postural limitations and is limited to sitting for thirty minutes at a time and standing for twenty minutes at a time. (Tr. 20-21).

Plaintiff argues that the RFC is "incomplete with regard to limitations resulting from [plaintiff's] psychological impairments[]" in that the RFC "never takes into account the extreme limitations in task performance found by [plaintiff's] treating sources." (Dkt. #25, at 17).[13] In his decision, the ALJ concluded that plaintiff is moderately limited in his ability

---

[13]Plaintiff's providers noted plaintiff's history of "severe" panic attacks; they noted that plaintiff is "not able to advocate for [him]self[]"; his appearance is "bizarre. . .[and] fidgety"; he moved slowly; he was "overweight[ and] disheveled"; he was oriented, with "fair" attention and concentration; and he was "not able to focus under pressure[.]" (Tr. 357). Additionally, according to his providers, plaintiff has "flight of ideas[,]" "obsessions at times[,]" a constricted affect, and his judgment and insight were impaired such that he was not able to make decisions without help. (Tr. 358). They opined that plaintiff had an obvious problem with his hygiene and a serious problem caring for his physical needs, using good judgment, using appropriate coping skills, and handling frustration appropriately. (Id.). Additionally, plaintiff is claustrophobic and unable to go out at times, and he is limited by an anxious mood, irrational fears, and an inability to "maintain [a] work day." (Tr. 358-59). His providers assessed him as having a serious problem interacting appropriately with others in a work environment; asking questions or requesting assistance; respecting/responding appropriately to others in authority; and getting along with others without distracting them. (Tr. 359). Additionally, plaintiff has an obvious problem carrying out single-step instructions, and a very serious problem carrying out multi-step instructions; focusing long enough to finish assigned simple tasks; changing from one simple task to another; performing basic work activities; and performing work on a sustained basis. (Id.).

to perform activities of daily living, is moderately limited with regard to his concentration, persistence or pace, and is markedly limited in his social functioning. (Tr. 19-20). These conclusions, as explained in Section II.B. <u>supra</u>, are supported by evidence in the record. Specifically, the ALJ's RFC assessment incorporated some of the limitations detailed by Faria to the extent they were consistent with the findings of the State agency psychologists[14] and with Faria's underlying treatment records (<u>see</u> Tr. 363-65, 410-12 (anxiety, risk for suicide, severe withdrawal), 366-67, 413-14 (anxious mood, blunted affect, delayed speech), 398-400 (anxious affect, depressed mood), 401-09 (overwhelmed in public environment, but volunteered and assisted at church functions; depressed mood and insight and judgment minimally impaired)). The State agency psychologists, upon which the ALJ relied, opined that plaintiff has moderate difficulties in maintaining concentration, persistence or pace, moderate restrictions in his activities of daily living, and marked difficulties in maintaining social functioning. (Tr. 79, 94). Additionally, the ALJ properly considered plaintiff's abilities as reflected in the underlying treatment records and by plaintiff's own reports of his activities. (<u>See</u> Tr. 20-21; <u>see</u> Tr. 50-51 (plaintiff reported that he volunteers twenty to twenty-five hours a month, attends church and goes to a men's fellowship on Saturdays.); <u>see also</u> Tr. 405, 407-09 (therapy discussions reflecting feeling overwhelmed in public places, performing volunteer work, relationships with neighbors and people at church, and helping

---

[14]<u>See</u> note 10 <u>supra.</u>

Dr. Carlson also noted that plaintiff's "[s]evere avoidance/social anxiety cause marked limitations in social interactions[]"; plaintiff has "difficulty tolerating any level of social interaction[]"; "[w]ork of a solitary nature, with few/infrequent social contacts would be best[]"; and his appearance was described as "'bizarre' and 'disheveled' and may be inappropriate for some work settings." (Tr. 82). Additionally, Dr. Carlson opined that plaintiff can "adapt to minor changes in the work environment, but frequent or major changes would cause significant anxiety[,]" and he would benefit from establishing work goals, and would be "apt to struggle with traveling to new/unfamiliar places due to anxiety, but can adjust to working in a single setting over time." (<u>Id.</u>). The ALJ appropriately incorporated these limitations into his RFC assessment.

with the holiday party)).[15]

The ALJ included limitations in plaintiff's "production requirements" in his hypothetical posed to the vocational expert (Tr. 62-63); however, as discussed further below, it is unclear whether the RFC assessment in the ALJ's decision accurately reflects the vocational expert's testimony. The vocational expert testified that "with the limitation in regards to production, pace, and things like that, I think – and with the other limitations in regards to the public contact or collaborative work with coworkers, I think I'm moving to sedentary-type jobs." (Tr. 63). The ALJ's failure to explicitly "incorporate non-exertional limitations in a hypothetical" would be "harmless error" if the "(1) medical evidence demonstrates that a claimant can engage in simple, routine tasks of unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work, or (2) the hypothetical otherwise implicitly accounted for a claimant's limitations in concentration, persistence, and pace." McIntrye v. Colvin, 758 F.3d 146, 152 (2d Cir. 2014)(internal quotations, citations & alterations omitted). In this case, as discussed further below, it is unclear whether the RFC assessment in the ALJ's decision accurately reflects the hypothetical posed to the vocational expert, and it is unclear whether the ALJ "sufficiently accounted for the combined effect of [plaintiff's] impairments." Id. (citation & internal quotations omtited).

The consideration of the ALJ's conclusion regarding plaintiff's RFC does not end here. In his decision, the ALJ initially concluded that plaintiff retains the RFC to perform "light work as defined in 20 CFR 404.1567(a)[.]" (Tr. 20). Light work is defined in 20 C.F.R. § 404.1567(b); sedentary work is defined in 20 C.F.R. § 404.1567(a). To further complicate

_____

[15]Defendant erroneously recites that plaintiff volunteers twenty to twenty-five hours per week, instead of per month. (Compare Dkt. #33, at 20 with Tr. 50).

matters, the ALJ later states that "[t]o determine the extent to which these limitations erode the unskilled <u>sedentary</u> occupational base, the [ALJ] asked the vocational expert whether jobs exist in the national economy for an individual" of the plaintiff's age, education, work experience, and RFC. (Tr. 25-26)(emphasis added). The ALJ continued, "[t]he vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations at the <u>sedentary</u> exertional level[.]" (Tr. 26 (emphasis added)). However, at the hearing, the ALJ asked the vocational expert to assume a hypothetical individual limited to "<u>light</u> exertional work . . . ." (Tr. 62 (emphasis added)).

Defendant argues that the ALJ's decision includes a "typographic error[,]" and such error is harmless as "the totality of the record, including the ALJ's RFC discussion and the hypothetical provided to the vocational expert at the hearing show that the ALJ determined that the claimant could perform light work." (Dkt. #33, at 19). However, the vocational expert's testimony is hardly that clear. After asking the vocational expert to assume a hypothetical individual limited to "<u>light</u> exertional work . . . " (Tr. 62 (emphasis added)) with stated limitations, the vocational expert testified that such a person could perform the work of a cleaner custodian, but when the limitation of work that did not involve constant standing and/or walking was added, the vocational expert testified that the cleaner custodian job would be precluded, and when additional limitations were added, the vocational expert testified: "I think I'm moving to sedentary-type jobs." (Tr. 62-63). Plaintiff is correct that it is "unclear from both the hearing [transcript] and the decision whether the ALJ is starting from a baseline RFC for sedentary work, or light work." (Dkt. #25, at 15).

Defendant is correct that the Regulations provide that if an individual has the capacity to perform light work, he also has the capacity to perform sedentary work, 20 C.F.R. § 404.1567(b)("If someone can do light work, we determine that he or she can also do

sedentary work.")(Dkt. #33, at 18-19), however, a person who is limited to performing sedentary work cannot perform light work, and it is not clear whether the ALJ's baseline RFC was for sedentary work or for light work.[16] That said, however, the vocational expert identified work that plaintiff could perform work at the sedentary level, but as discussed above, it is not clear if such conclusion accounts for plaintiff's non-exertional impairments.

"In order to permit a court reviewing an ALJ's disability determination to determine whether there is substantial evidence to support the Commissioner's decision, an ALJ must set forth with sufficient specificity the relevant factors justifying its findings." Clark v. Berryhill, 697 F. App'x 49, 49-50 (2d Cir. 2017), citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). Defendant argues that "typographical errors . . . do not warrant a remand of the entire case, so long as the court can understand the ALJ's intention in the context of the decision[,]" as the court "can look to other portions of the ALJ's decision and to the administrative record to clarify and rectify the typographical error." (Dkt. #33, at 19, citing Petrie v. Astrue, 412 F. App'x 401, 409 (2d Cir. 2011); Wesley v. Comm'r of Soc. Sec., No. 16 CV 4882, 2017 WL 2116686, at *3 (S.D.N.Y. May 15, 2017)). However, in this case, such a task is not that easy. In light of the inconsistency of the language used by the ALJ in several portions of his decision, and in light of the content of the vocational expert's testimony, the Court is unable to review the ALJ's basis for his RFC finding.

Accordingly, this matter is remanded for a rehearing for consideration and clear articulation of the ALJ's RFC finding. In light of this conclusion, the Court need not address

---

[16]Although plaintiff argues that the ALJ erred by not specifying whether plaintiff is limited to sitting for thirty minutes and standing for twenty minutes, versus limited to alternating between the two (Dkt. #25, at 16-17), it is clear from plaintiff's testimony that he could stand for fifteen to twenty minutes before having to sit down, and could sit for twenty to thirty minutes before having to stand, and that when performing kettle work for the Salvation Army, he alternated between sitting and standing. (Tr. 54-55).

the ALJ's step five decision as such decision must be revisited after consideration of plaintiff's RFC on remand.

## IV. CONCLUSION

For the reasons stated above, plaintiff's Motion for Judgment on the Pleadings (Dkt. #24) is granted in part and denied in part, and defendant's Motion to for Judgment on the Pleadings (Dkt. #33) is denied in part and granted in part.[17]

Dated at New Haven, Connecticut, this 20th day of March, 2018.


　/s/ Joan G. Margolis, USMJ　
Joan Glazer Margolis
United States Magistrate Judge

---

[17]After having had the great privilege of serving as a U.S. Magistrate Judge for more than thirty-three years and now facing retirement in approximately five weeks, this decision is the last Social Security ruling to be filed by this judicial officer. This Magistrate Judge estimates that she has filed at least 350 rulings on Social Security matters, starting with one filed in March 1985, just one month after she began this position. This judicial officer has never lost sight of how critical these Social Security files are to the parties involved, and few other rulings issued in federal court have the profound impact on the parties as these do.

Starting in August 2002, this Magistrate Judge has had the great assistance of her highly talented career law clerk, Monica Watson Cucchiarelli, in approximately 150 of these Social Security rulings. Ms. Watson's contribution to the development of Social Security law in this district has been immeasurable, and there are few lawyers as knowledgeable, and talented, about these matters than she is. The only reason this Magistrate Judge has remained relatively current with her Social Security docket, which began to soar in 2009 and continues to do so at a dramatically escalating pace, is due to the diligence, perseverance, and wisdom of Ms. Watson, who consistently gave up her evenings and weekends to work on these files. The Social Security bar, the District Court, and this judicial officer in particular, owe Ms. Watson their deepest gratitude.